**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

JEROME JUNIOR WASHINGTON,    )
                                 )     Civil Action No. 18 – 1390
             Plaintiff,     )
                                 )
     v.                           )     Magistrate Judge Lisa Pupo Lenihan
                                 )
JOHN E. WETZEL, *Commissioner*,    )
ROBERT D. GILMORE,    )
*Superintendent/Warden*, *SCI Greene*,    )
CANDICE LACKEY, *Unit Manager*,    )
PSYCHIATRIST BURGER,    )
PSYCHOLOGIST BAWDY,    )
DEPUTY DIALESANDRO, *Deputy*    )
*Superintendent*, ZAKEN, *Deputy of*    )
*Security*, SGT. CHESMER,    )
*Correctional Officer*, C.O. MILLER,    )
SGT. BEERS, *Correctional Officer*,    )
LT. JELLOT, *Correctional Guard*,    )
C.O. STEFFIN, TODD H. FUNK,    )
*Correctional Staff Member,* MAJOR    )
BUZAS, COUNSELOR SPIKER,    )
PSYCHOLOGIST BRITTANY    )
NOVAJ, SERGEANT ROGERS, and    )
SHIRLEY MOORE,    )
                                 )
             Defendants.    )

## MEMORANDUM OPINION

Currently pending before the Court is a Motion for Summary Judgment filed by the

Corrections Defendants.  (ECF No. 118.)  For the following reasons, the Motion will be granted.

### A. Procedural Background

Plaintiff, Jerome Junior Washington ("Plaintiff"), is an inmate currently in the custody of

the Pennsylvania Department of Corrections ("DOC").  He initiated this *pro se* prisoner civil

rights action in October 2018, and his Complaint was docketed after he was granted leave to proceed *in forma pauperis* on October 31, 2018.  (ECF Nos. 1-3.)  He filed two Supplements to his Complaint on December 13 and 14, 2018, respectively.  (ECF Nos. 9, 10.)

In essence, Plaintiff's claims arise out of his placement and confinement in the Secure Residential Treatment Unit ("SRTU") at the State Correctional Institution at Greene ("SCI-Greene"), where Plaintiff was previously confined.[1]  The Corrections Defendants[2] have moved

---

[1] Plaintiff was confined in the SRTU at SCI-Greene from July 30, 2016, until he was placed in the Diversionary Treatment Unit at SCI-Greene on April 4, 2019, and then subsequently transferred to the Behavioral Management Unit at SCI-Rockview on June 29, 2020.  (ECF No. 119, ¶¶ 3-5, 86-87.)  According to the Corrections Defendants, the SRTU was created as an alternative to the DOC's Restricted Housing Unit ("RHU").  (ECF No. 119, ¶ 40.)  Lucas D. Malishchak, the Director of the Psychology Office for the DOC states that "[t]he primary purpose of the SRTU is to avoid the prolonged placement of individuals with serious mental illnesses, significant functional impairments, and/or intellectual disabilities with RHUs. However, despite these known vulnerabilities, in certain situations, the Department has the need to securely house these individuals if they exhibit behavior that is continually disruptive, violent, dangerous, a threat to the orderly operation of the prison, or have been repeatedly subject to disciplinary action or investigations.  The SRTU is specifically designed to provide individual and group mental health treatment from qualified mental health professionals to those individuals secured in these units and to provide an opportunity for these individuals to demonstrate a stable level of behavior with the goal, if possible, of eventually returning to a less restrictive and less secure housing unit."  (ECF No. 119, ¶ 39.)

[2] The Corrections Defendants include former Secretary of the Pennsylvania DOC John E. Wetzel ("Wetzel"), former Superintendent of SCI-Greene Robert D. Gilmore ("Gilmore"), Unit Manager for G Unit at SCI-Greene in 2018 Candace Lackey ("Lackey"), Psychological Services Associate assigned to G Unit in 2018 John Brawdy ("Brawdy"), Deputy Superintendent for Centralized Services at SCI-Greene in 2018 Mark DiAlesandro ("DiAlesandro"), Deputy Superintendent for Facilities Management at SCI-Greene in 2018 Mike Zaken ("Zaken"), Corrections Officer II at SCI-Greene in 2018 Sergeant William Chesmer ("Chesmer"), Corrections Officer I at SCI-Greene in 2018 Miller ("Miller"), Corrections Officer II at SCI-Greene in 2018 Sergeant Beer ("Beer"), Corrections Officer III at SCI-Greene in 2018 Lieutenant Jellot ("Jellot"), Corrections Officer I at SCI-Greene in 2018 Steffin ("Steffin"), Corrections Food Service Manager I at SCI-Greene in 2018 Todd H. Funk ("Funk"), Corrections Officer V at SCI-Greene in 2018 Major Buzas ("Buzas"), Correctional Counselor at SCI-Greene in 2018 Jason Spiker ("Spiker"), Psychological Services Specialist at SCI-Greene Brittany Novak ("Novak"), Corrections Officer II at SCI-Greene in 2018 Sergeant Rogers ("Rogers"),

for summary judgment on all claims raised in the Complaint (ECF No. 3) and Supplements

thereto (ECF Nos. 9, 10).[3]  Plaintiff has filed responses in opposition to summary judgment

(ECF Nos. 125-136), and so the Corrections Defendants' Motion is now ripe for review.

### B.  <u>Standard of Review</u>

Summary judgment is appropriate if, drawing all inferences in favor of the nonmoving

party, "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Summary judgment may be

granted against a party who fails to adduce facts sufficient to establish the existence of any

element essential to that party's case, and for which that party will bear the burden of proof at

trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying evidence, or the lack thereof,

which demonstrates the absence of a genuine issue of material fact.  <u>Nat'l State Bank v. Fed.l</u>

<u>Reserve Bank of New York</u>, 979 F.2d 1579, 1581-82 (3d Cir. 1992) (citing <u>Celotex</u>, 477 U.S. at

323-25).  Once that burden has been met, the nonmoving party may not rest on the allegations in

the complaint, but must "go beyond the pleadings and by [his] own affidavits, or by the

'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting FED. R. CIV.

P. 56(e) (1963).  <i>See also</i> <u>Orsatti v. New Jersey State Police</u>, 71 F.3d 480, 484 (3d Cir. 1995)

("plaintiff cannot resist a properly supported motion for summary judgment merely by restating

---

and former Executive Deputy Secretary for the Pennsylvania DOC Shirley Moore ("Moore").
(ECF No. 119, ¶¶ 6-26.)

[3] By Memorandum Opinion and Order dated March 6, 2020, the Court granted the Motion to
Dismiss filed by Defendant Berger and dismissed the claims against her with prejudice.  (ECF
No. 58.)  Therefore, the only remaining claims are asserted against the Corrections Defendants.

the allegations of his complaint, but must point to concrete evidence in the record that supports

each and every essential element of his case.") (citing <u>Celotex</u>, *supra*).

An issue is genuine only "if the evidence is such that a reasonable jury could return a

verdict for the non-moving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In <u>Anderson</u>, the United States Supreme Court noted the following:

> [A]t the summary judgment stage the judge's function is not himself to
> weigh the evidence and determine the truth of the matter but to determine whether
> there is a genuine issue for trial. …[T]here is no issue for trial unless there is
> sufficient evidence favoring the nonmoving party for a jury to return a verdict for
> that party. If the evidence is merely colorable, or is not significantly probative,
> summary judgment may be granted.

<u>Id</u>. at 249-50 (internal citations omitted).

### C.  <u>Discussion</u>

#### 1.  <u>Failure to exhaust</u>

First, the Court must address the fact that the Corrections Defendants move for summary

judgment on the basis that Plaintiff failed to exhaust his available administrative remedies as

required by the Prison Litigation Reform Act ("PLRA") with respect to "several of his claims" as

well as "any claim for monetary damages and any claims against Wetzel, Moore, Gilmore and

other supervisory prison officials."  *See* ECF No. 118, p.10.  As part of the PLRA, prisoners are

required to first exhaust all administrative remedies as are available prior to bringing an action

with respect to prison conditions pursuant to 42 U.S.C. § 1983, or any other federal law.  *See* 42

U.S.C. § 1997e(a).  Specifically, the act provides in pertinent part as follows:

> No action shall be brought with respect to prison conditions under section 1983 of
> this title, or any other Federal law, by a prisoner confined in any jail, prison, or
> other correctional facility until such administrative remedies as are available are
> exhausted.

42 U.S.C. § 1997e(a).  Exhaustion is mandatory under this provision regardless of the type of relief sought and the type of relief available through administrative procedures.  *See* Booth v. Churner, 532 U.S. 731, 741 (2001).

While the Corrections Defendants do an admirable job attempting to sort out the numerous grievances Plaintiff filed during the relevant time period and provide the Court with two charts of Plaintiff's extensive grievance history in 2018, they do not provide the Court with the complete relevant grievance record for Plaintiff and their charts do not contain all of the relevant information for the Court to make a finding as to exhaustion on every claim asserted in the Complaint.  To the extent the Court is able to make a finding on exhaustion, it will do so in discussion of the individual claims discussed below and in the alternative to addressing the merits of Plaintiff's claims.

### 2.  Official capacity claims

Plaintiff has sued the individual Corrections Defendants in their respective official capacities.  *See* ECF No. 3, ¶¶ 18, 71, 98; No. 9, ¶ 2; No. 10, ¶ 5.  In this regard, it is well established that lawsuits seeking retrospective relief by private persons against a state, state officials, and state entities are generally barred by the Eleventh Amendment.  *See* Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997) (stating that "[i]t has long been settled" that the Eleventh Amendment applies to "not only actions in which a State is actually named as the defendant, but also certain actions against state agents and instrumentalities").  Relevant here, Eleventh Amendment immunity bars actions for retroactive relief against state officials acting in their official capacity because "'a judgment against a public servant in his official capacity imposes liability on the entity that he represents . . . .'"  Kentucky v. Graham, 473 U.S. 159, 169 (1985) (quoting Brandon v. Holt, 469 U.S. 464, 471 (1985) (internal quotation omitted)); *see*

*also* Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. . . . As such, it is no different from a suit against the State itself.").  Thus, "when the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants."  Ford Motor Co. v. Department of Treasury of State of Indiana, 323 U.S. 459, 464 (1945).  A state may waive the defense by consenting to be sued and Congress may abrogate state sovereign immunity pursuant to its power to enforce the Fourteenth Amendment.  Koslow v. Pennsylvania, 302 F.3d 161, 168 (3d Cir. 2002).

In this case, Plaintiff seeks monetary damages against the individual Corrections Defendants, all employees of the Pennsylvania Department of Corrections, and he has sued them in their official capacities, in addition to their individual capacities.  However, the Pennsylvania Department of Corrections is undoubtedly a state instrumentality and its officials are state agents. *See* 71 Pa. C.S.A. § 61 ("executive and administrative work of [the Commonwealth of Pennsylvania] shall be performed by" various executives and administrative agencies, including the "Department of Corrections").  As such, they are protected from suit by Eleventh Amendment immunity unless either exception to state sovereign immunity applies.  Pennsylvania, however, has not waived its sovereign immunity defense in federal court, *see* 42 Pa. C.S.A. § 8521(b), and Congress did not abrogate Eleventh Amendment immunity via 42 U.S.C. § 1983.  *See* Quern v. Jordan, 440 U.S. 332, 345 (1979) (concluding that the history and language of § 1983 indicate that Congress did not intend to make states liable under the statute).  Thus, state sovereign immunity prohibits Plaintiff's claims against the individual Corrections Defendants insofar as they are sued in their respective official capacities.

6

### 3. __Injunctive and declaratory relief__

In addition to compensatory relief, Plaintiff seeks prospective injunctive relief from the individual Corrections Defendants.  *See* ECF No. 3, ¶¶ 79-87.  This claim for relief could have relevance to Plaintiff's claims against the Defendants in their official capacities because the law recognizes an exception to the Eleventh Amendment for claims brought against state officials in their official capacities for prospective injunctive relief.  *See* Guilday v. Crisis Ctr. at Crozer-Chester Med. Ctr., 2022 WL 507484, at *3 (E.D. Pa. Feb. 17, 2022) ("[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.") (internal citations omitted).  This exception to Eleventh Amendment immunity provides federal courts with authority to issue injunctions against state officers where there is evidence of ongoing violations of federal law and the injunction will afford a plaintiff prospective relief from the illegal state action.  Ex parte Young, 209 U.S. 123, 159-60 (1908).  Essentially, Ex parte Young provides a means for plaintiffs to seek prospective injunctive relief for ongoing violations of federal law by bringing an official capacity action against state officials, rather than against a state directly, without running afoul of the Eleventh Amendment.  *See* Graham, 473 U.S. at 167 n.14; *see also* Koslow, 302 F.3d at 177 n.20.

To the extent Plaintiff is seeking injunctive relief against the individual Corrections Defendants, such claims are moot because Plaintiff is no longer incarcerated at SCI-Greene.  In this regard, it is well established that the adjudicatory power of a federal court depends upon "the continuing existence of a live and acute controversy."  Steffel v. Thompson, 415 U.S. 452, 459 (1974).  "The rule in federal cases is that an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  Id. at 459 n.10.  "Past exposure to illegal

conduct is insufficient to sustain a present case or controversy regarding injunctive relief if unaccompanied by continuing, present adverse effects." Rosenberg v. Meese, 622 F.Supp. 1451, 1462 (S.D.N.Y. 1985) (citing O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974)). Thus, a prisoner's transfer or release from the facility complained of generally moots his claims for injunctive relief because he is no longer subject to the conditions he alleges are unconstitutional. Sutton v. Rasheed, 323 F.3d 236, 248 (3d Cir. 2003); Abdul-Akbar v. Watson, 4 F.3d 195, 206-07 (3d Cir. 1993). While there is an exception to this mootness doctrine when "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again[,]" Weinstein v. Bradford, 423 U.S. 147, 349 (1975), the Court cannot speculate that Plaintiff will once again be incarcerated in the SRTU at SCI-Greene, see, e.g., Abdul-Akbar, 4 F.3d at 207. As such, Plaintiff cannot invoke this exception to the mootness doctrine.

Plaintiff also appears to be seeking a declaratory judgment in the form of a declaration that the Corrections Defendants violated his rights under the United States Constitution. However, Plaintiff's request is inappropriate because declaratory judgment is unavailable "solely to adjudicate past conduct" or "to proclaim that one party is liable to another." Corliss v. O'Brien, 200 F. App'x 80, 84 (3d Cir. 2006); see also Andela v. Administrative Office of the U.S. Courts, 569 F. App'x 80, 83 (3d Cir. 2014) ("Declaratory judgments are meant to define the legal rights and obligations of the parties in the anticipation of some future conduct."). As Plaintiff essentially seeks a declaration that the Corrections Defendants' past actions violated his rights in various respects, he is not entitled to declaratory relief.

### 4. Fifth and Ninth Amendment claims

Plaintiff asserts claims under, *inter alia*, the Fifth and Ninth Amendments to the United States Constitution. *See* ECF No. 3, ¶¶ 18, 69-71, 78, 98; No. 9, ¶ 2; No. 10, ¶¶ 1-3.

With respect to Plaintiff's Fifth Amendment claim, "the due process clause under the Fifth Amendment only protects against federal governmental action and does not limit the actions of state officials." Caldwell v. Beard, 324 F. App'x 186, 189 (3d Cir. 2009) (citing Riley v. Camp, 130 F.3d 958, 972 n.19 (11th Cir. 1997)). In other words, a due process claim under the Fifth Amendment only applies to federal officials. *See* Bergdoll v. City of York, 515 F. App'x 165, 170 (3d Cir. 2013) (citing Nguyen v. U.S. Catholic Conference, 719 F.2d 52, 54 (3d Cir. 1983)). As alleged in the Complaint, the Corrections Defendants are employed by the Commonwealth of Pennsylvania, and, consequently, they are state officials or actors. *See*, *e.g.*, Scott v. Erdogan, 2013 WL 791532, at *1 (M.D. Pa. Mar. 4, 2013) ("[A]ll of the defendants are employed by the DOC, making all of the defendants state actors for the purposes of this action."). Because the Corrections Defendants are not federal actors, the Fifth Amendment's Due Process Clause is inapplicable to them. *See*, *e.g.*, Houser v. Folino, 2015 WL 7289405, at *1 (W.D. Pa. Nov. 16, 2015) ("Because Plaintiff's claims are alleged against state actors, any Fifth Amendment claim must fail"); Spell v. Allegheny County Admin., 2015 WL 1321695, at *5 (W.D. Pa. Mar. 24, 2015) (same). *Cf.* Banks v. Mozingo, 423 F. App'x 123, 128 (3d Cir. 2011) ("[S]ince none of the defendants are agents of the federal government, the Fifth Amendment is inapplicable.") (citing Chavez v. Martinez, 538 U.S. 760, 788 (2003)).

With respect to Plaintiff's Ninth Amendment claim, the Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend IX. It has "never been recognized as independently securing any constitutional right[] for purposes of pursuing a civil rights

claim." <u>Strandberg v. City of Helena</u>, 791 F.2d 744, 748 (9th Cir. 1986).  Because the Supreme

Court has repeatedly voiced concern that a section 1983 claim be based on a specific

constitutional guarantee, *see*, *e.g.*, <u>Daniels v. Williams</u>, 474 U.S. 327 (1986); <u>Parratt v. Taylor</u>,

451 U.S. 527, 544 (1981); <u>Paul v. Davis</u>, 424 U.S. 693, 700-01 (1976), this claim cannot

proceed.

### 5.  <u>Lack of personal involvement</u>

The Corrections Defendants assert that Plaintiff has failed to demonstrate personal

involvement by Corrections Defendants Wetzel, Gilmore, Moore, DiAlesandro and Zaken in the

complained of violations of his rights.  In this regard, it is well settled that a "defendant in a civil

rights action must have personal involvement in the alleged wrongs; liability cannot be

predicated solely on the operation of *respondeat superior*." <u>Rode v. Dellarciprete</u>, 845 F.2d

1195, 1207 (3d Cir. 1988) (citing <u>Parratt v. Taylor</u>, 451 U.S. 527, 537 n.3 (1981) (other citation

omitted)).  A plaintiff must aver this personal involvement through allegations of participation,

personal direction or actual knowledge and acquiescence, and these allegations "must be made

with appropriate particularity." <u>Rode</u>, 845 F.2d at 1207; *see also* <u>Ashcroft v. Iqbal</u>, 556 U.S.

662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a

plaintiff must plead that each Government-official defendant, through the official's own

individual actions, has violated the Constitution.").

In the context of a defendant who is alleged to have performed in a supervisory role,

courts have identified two general instances in which either the conduct of that supervisor-

defendant or the policies and procedures of that supervisor-defendant may amount to personal

involvement and thereby warrant a finding of individual, supervisory liability for a constitutional

tort.  First, supervisory liability may attach if the supervisor personally "participated in violating

the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in a subordinate's unconstitutional conduct. <u>A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.</u>, 372 F.3d 572, 586 (3d Cir. 2004) (citing <u>Baker v. Monroe Twp.</u>, 50 F.3d 1186, 1190-91 (3d Cir. 1995)).  Second, liability may attach if the supervisor, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm."  <u>Id.</u> (quoting <u>Stoneking v. Bradford Area Sch. Dist.</u>, 882 F.2d 720, 725 (3d Cir. 1989)).

Corrections Defendants Wetzel, Gilmore and Moore are high level administrators in the DOC and Plaintiff's allegations against them appear to be based entirely on their respective supervisory roles within the DOC.  <i>See</i> ECF No. 3, ¶¶ 6 (Gilmore), 69 (Wetzel), 70 (Moore); No. 10, ¶ 4 (Moore).  Plaintiff's allegations against DiAlesandro and Zaken similarly appear to impose liability for their respective supervisory positions at SCI-Greene.  <i>See</i> ECF No. 3, ¶¶ 10 (DiAlesandro), 11 (Zaken).  Plaintiff does not allege that these Corrections Defendants were actually involved in, directed, had actual knowledge of or gave acquiescence to the various events or circumstances alleged in his Complaint, nor does he allege that they personally established and maintained any identifiable policy or practice which, in turn, directly caused the alleged constitutional harm to him.  Instead, it appears that he seeks to impose liability on them based on principles of <i>respondeat superior</i>, which is not sufficient to show personal involvement.  Nor is it sufficient to show personal involvement to the extent he seeks to impose liability on them for their mere participation in the grievance review process.  <i>See</i> <u>Simonton v. Tennis</u>, 437 F. App'x 60, 62 (3d Cir. 2011) ("[A] prison official's secondary review of an inmate's grievance or appeal is not sufficient to demonstrate the personal involvement required to establish the deprivation of a constitutional right.") (citing <u>Rode</u>, 845 F.2d at 1207-08);

Brooks v. Beard, 167 F. App'x 923, 925 (3d Cir. 2006) (a state prisoner's allegation that prison officials and administrators responded inappropriately, or failed to respond to later-filed grievances about his medical treatment, did not establish that the officials and administrators were involved in the underlying allegedly unconstitutional conduct). *See also* Mearin v. Swartz, 951 F. Supp.2d 776, 782 (W.D. Pa. 2013) ("merely participating in the grievance process is insufficient to confer knowledge of, and acquiescence to, a constitutional violation"); Wilkerson v. Schafer, 2011 WL 900994, at *7 (M.D. Pa. Mar. 14, 2011) ("participation in after-the-fact review of a grievance or appeal is insufficient to establish personal involvement on the part of those individuals reviewing grievances"); Croom v. Wagner, 2006 WL 2619794, at *4 (E.D. Pa. Sept. 11, 2006) ("neither the filing of a grievance nor an appeal of a grievance . . . is sufficient to impose knowledge of any wrongdoing"); Ramos v. Pa. Dept. of Corr., 2006 WL 2129148, at *2 (M.D. Pa. July 27, 2006) (the review and denial of the grievances and subsequent administrative appeal does not establish personal involvement).  This would include the claims Plaintiff purports to make against Defendant Gilmore, *see* ECF No. 3, ¶¶ 48-56, 66-67, and Defendant Jellot for his participation in the grievance review process in relation to Grievance No. 738238. *See* ECF No. 3, ¶¶ 29-36.

Similarly, involvement in *after-the-fact* reviews or investigations of inmate complaints is not sufficient to establish the necessary personal involvement under Section 1983.  *See* Miller v. Knight, 2021 WL 4445014, at *5 n.4 (W.D. Pa. Sept. 28, 2021) (citing cases).  In his Supplement, Plaintiff purports to make claims against Defendant Buzas for his responses to an inmate request dated November 24, 2018, wherein Plaintiff raised several issues.  However, all of these issues appear to concern after-the-fact notice of alleged misconduct and not any serious threat of ongoing harm.  For example, they include Plaintiff's complaints about alleged harassing

12

verbal comments made by corrections officers, dissatisfaction with SRTU programming, toilets flooding in the housing unit, and the water to his cell being turned off.  *See* ECF No. 9, ¶¶ 3-8. Informing Defendant Buzas about these discrete incidents that already happened via a request slip does not establish personal involvement in the underlying action on the part of Buzas.  Nor does it establish personal involvement on the part of Defendant Gilmore when Plaintiff similarly alleges that he "turned a blind eye" to the events and circumstances alleged in the Complaint after he informed him of said events and circumstances after the fact.  *See* ECF No. 3, ¶¶ 40-45.

In his other Supplement, Plaintiff does make some specific allegations against Defendant Moore, claiming that she is not checking on the out-of-cell hours for SRTU inmates, that she is allowing inmates to be locked down for 20, 22 or 24 hours a day without access to psychiatric or psychological services and that she is not otherwise maintaining oversight over the SRTU and its staff.  *See* ECF No. 10, ¶¶ 10-12.  However, Plaintiff has failed to provide any specifics with respect to these allegations, and, in any event, the summary judgment record demonstrates that Defendant Moore was not involved in the day-to-day operations of the SRTU at SCI-Greene and was not aware of any issues concerning out-of-cell hours for inmates in the SRTU at SCI-Greene or concerns about access to psychiatric or psychological services in the unit.  *See* ECF No. 120-13, ¶¶ 13, 16-17.  There is therefore a lack of any evidence to demonstrate that Defendant Moore was personally involved in these underlying matters.

**6.  <u>Access to courts</u>**

Plaintiff appears to assert two First Amendment access to courts claims.  First, he alleges that on July 26, 2018, Defendant Beer refused him envelopes to send out his legal mail or final appeal to his grievances and told him that he needed to write a request to Unit Manager Lackey in order to receive the envelopes.  *See* ECF No. 3, ¶ 46.  Second, he alleges that on April 19,

2018, the mailroom refused him postage because he had already used his monthly allotment for legal mail provided to indigent inmates.  *See* ECF No. 3, ¶ 67; *see also* ECF No. 120-8, p.8.

First, it appears that Plaintiff failed to exhaust his administrative remedies with respect to the second of these access to courts claims.[4]  The summary judgment record reveals that Plaintiff did not timely appeal Grievance No. 732708 to final review.  *See* ECF No. 120-8, pp.7-14. Because the PLRA mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court, and "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[,]" Woodford v. Ngo, 548 U.S. 81, 90-91 (2006), this claim appears to be barred for Plaintiff's failure to exhaust.

Nevertheless, the Corrections Defendants correctly argue that Plaintiff's claims also fail on their merits.  While prisoners retain a right of access to the courts, *see* Lewis v. Casey, 518 U.S. 343, 346 (1996), to establish a cognizable access to courts claim, a prisoner must show (1) that they suffered an "actual injury" – that they lost a chance to pursue a "nonfrivolous" or "arguable" underlying claim; and (2) that they have no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial of access suit.  *See* Christopher v. Harbury, 536 U.S. 403, 415 (2002).  Here, Plaintiff has not alleged, much less demonstrated, the loss of a nonfrivolous or arguable claim as a result of any conduct attributed to any Corrections Defendant.  Moreover, prisoners do not have a constitutional right to unlimited free postage.  *See* Salkeld v. Tennis, 2006 WL 2794222, at *2 (M.D. Pa. Sept. 27, 2006) (citing cases).

---

[4] While Plaintiff does not identify any grievance related to his claim against Corrections Defendant Beer, from the Corrections Defendants' chart it appears that Grievance No. 749188, which was appealed to final review, may have concerned the conduct complained about by Plaintiff in his Complaint.

To the extent Plaintiff may also be asserting a claim regarding denial of access to or interference with the grievance review process at SCI-Greene, no such claim can be advanced because there is no constitutional right to a prison grievance procedure.  *See* Simonton v. Tennis, 437 F. App'x 60, 62 (3d Cir. 2011) ("[A]ccess to prison grievance procedures is not a constitutionally-mandated right."); Heleva v. Kramer, 214 F. App'x 244, 247 (3d Cir. 2007) ("The District Court was correct, however, in concluding that defendants' alleged obstruction of prison grievance procedures does not give rise to an independent claim.  Prisoners do not have a constitutional right to prison grievance procedures.").  At worst, any alleged interference with a grievance may abrogate the need to exhaust administrative remedies with respect to an underlying claim.

### 7.  **Deprivation of property**

Plaintiff claims that, on June 6, 2018, Corrections Officers Steel, Rmniok, McGinnis and Conicilla did not give him a confiscation slip or an inventory property sheet and therefore "stole" his property.  *See* ECF No. 3, ¶¶ 65-66.

Although the individuals who Plaintiff names are responsible for stealing his property are not named as defendants in this lawsuit, it appears that Plaintiff failed to exhaust his administrative remedies with respect to this claim because he did not comply with the DOC's inmate grievance procedure when appealing Grievance No. 741332 to final review.  *See* ECF No. 120-8, pp.67-77.  Nevertheless, the Corrections Defendants correctly argue that Plaintiff's claim with respect to his property fails because Plaintiff had access to and took advantage of an adequate post deprivation remedy – the Pennsylvania DOC's grievance procedure.  *See* Monroe v. Beard, 536 F.3d 198, 209-10 (3d Cir. 2008) (per curiam) (holding that prison officials that confiscated inmate legal materials did not violate the Due Process Clause in part because

Pennsylvania DOC's grievance procedure provided an adequate post deprivation remedy); Tillman v. Lebanon Cnty. Corr. Facility, 221 F.3d 410, 422 (3d Cir. 2000) (holding that the "plaintiff had an adequate post deprivation remedy in the grievance program").

To the extent Plaintiff claims that the deprivation of his property denied him access to the courts because he did not have access to his legal work and legal documents, his claim also fails because he has failed to identify a nonfrivolous or arguable legal claim that he lost, or what was contained in his legal documents and how the deprivation of those documents would have led to a different outcome.  *See* Christopher, 536 U.S. at 415.

**8.   Conditions of confinement**

Plaintiff asserts numerous claims against the Corrections Defendants premised on the conditions of his confinement in the SRTU at SCI-Greene.  In this regard, the Eighth Amendment imposes a duty on prison officials to provide "humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832 (1994).  In Wilson v. Seiter, 501 U.S. 294 (1991), the Supreme Court set forth the standard for alleged violations of the Eighth Amendment while addressing non-medical conditions of confinement.  The Court held that the "deliberate indifference" standard applied in Estelle v. Gamble, 429 U.S. 97 (1976), applies generally to prisoner challenges to conditions of confinement.  Wilson, 501 U.S. at 303.  To succeed on an Eighth Amendment conditions of confinement claim, the inmate must demonstrate both an objective element and a subjective element.  For the objective element, the prisoner must demonstrate "deprivations denying 'the minimal civilized measure of life's necessities.'" Wilson, 501 U.S. at 298 (quoting Rhodes, 452 U.S. at 347).  For the subjective element, the prisoner must demonstrate that prison officials acted with a sufficiently culpable mind.  Wilson,

16

501 U.S. at 303.  Where conditions are not "cruel and unusual" but merely "restrictive and even

harsh," they do not violate the Eighth Amendment but rather "are part of the penalty that

criminal offenders pay for their offenses against society."  Rhodes, 452 U.S. at 347.

### a.  Lack of out-of-cell activities

Plaintiff claims that under Defendant Lackey's supervision, inmates in the SRTU are not

provided with sufficient out-of-cell activities, both structured and non-structured.[5]  *See* ECF No.

3, ¶¶ 22-23, 25, 32-36.  For example, he claims that groups are often canceled, inmates are not

taken out of their cells on time, and there are no longer activities such as bingo, X-box, board

games, arts and crafts, and movies.

As previously stated, to satisfy the objective prong of an Eighth Amendment claim, the

inmate must show that he is incarcerated under conditions that deprive him of "the minimal

civilized measure of life's necessities."  Rhodes, 452 U.S. at 347.  While there is no question that

---

[5] According to Section 10 of DOC Policy 13.8.1, Access to Mental Health Care Procedures Manual, which governs the Secure Residential Treatment Unit:

> Structured activities are those that are lead/facilitated by a Department or contracted staff member, or a Volunteer.  These may include:  Morning Meetings, Mental Health groups, the HELPING: Multimodel Self-Change Approach, Carey Guides, Relapse Prevention Plan, AOD, chaplaincy, Thinking for a Change groups, Violence Prevention, Taking a Chance on Change groups, Start Now program, groups run by activities staff, education, Reentry groups and modules on accepting mental illness, activities for challenged inmates, body basics, staying healthy on your medications, exploring the United States, handle anger better, personal hygiene, planning for a better life, self-esteem, social skills for challenged inmates, and substance abuse treatment introduction and other treatment interventions.

> Unstructured activities are defined as activities occurring outside the cell but not conducted by Department staff members.  For example: law library, recreation, visits, viewing movies, eating in small groups, and reading out-of-cell.

*See* ECF No. 120-4, p.37.

meaningful recreation "is extremely important to the psychological and physical well-being of the inmates[,]" Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979), it must be remembered that "confinement in a prison . . . is a form of punishment . . . ," Rhodes, 452 U.S. at 345 (internal quotation omitted). Nevertheless, "the prison environment itself may not be so brutal or unhealthy as to be in itself a punishment." Tillery v. Owens, 907 F.2d 418, 426 (3d Cir. 1990).

Here, the summary judgment record indicates that inmates in the SRTU are offered, at a minimum, ten structured and ten unstructured out-of-cell hours of programming a week. *See* ECF No. 120-4, p.37. However, even if Plaintiff's allegations are true about a decrease in structured and unstructured activities offered to SRTU inmates, Plaintiff has certainly not demonstrated that such conditions satisfy the objective component of an Eighth Amendment claim. Indeed, Plaintiff's allegations are not comparable to the prolonged periods of solitary confinement in which courts have found to satisfy this standard. *See* Porter v. Pennsylvania Department of Corrections, 974 F.3d 431 (3d Cir. 2020) (a reasonable jury could conclude that thirty-three years in solitary confinement posed a substantial risk of harm to inmate); *see also* Noble v. Wetzel, 2021 WL 6071490, at *3 (W.D. Pa. Dec. 23, 2021) (nearly twenty years of solitary confinement satisfied the objective Eighth Amendment standard). Moreover, it appears that Plaintiff failed to exhaust his administrative remedies with respect to the grievances he filed on this issue; Grievance Nos. 724291, 738238. *See* ECF No. 120-7, pp.2-3; No. 120-8, pp.1-6.

To the extent Plaintiff is attempting to assert a claim against the Corrections Defendants for violating DOC policy 13.8.1 by not providing the SRTU inmates with the required amount of structured and unstructured activities, Pennsylvania DOC's policies do not create a right and therefore do not have the force of law. *See* Atwell v. Lavan, 557 F.Supp.2d 532, 556 n.24 (M.D. Pa. Mar. 26, 2008) (citing cases). *See also* United States v. Fattah, 858 F.3d 801, 813-14 (3d Cir.

18

2017) (citing <u>United States v. Christie</u>, 624 F.3d 558, 573 (3d Cir. 2010) for approval that a "violation of internal policy alone does not amount to a violation of constitutional due process" because government policies and guidelines "do not themselves create rights"). As such, a violation of said policy does not automatically rise to the level of a Constitutional violation.

### b. Denial of yard and shower

Plaintiff claims that he was denied yard on April 19 and/or 22, 2018. *See* ECF No. 3, ¶¶ 37-38. He also claims that he was denied yard, shower and group activities on October 10, 2018. *See* ECF No. 3, ¶¶ 97-98.

When considering whether a deprivation of outdoor exercise amounts to a substantial deprivation, Courts of Appeals have suggested that "courts should consider the totality of the circumstances, including, but not limited to, the length of the deprivation, the availability of recreation within the cell, and whether the inmate suffered any ill health effects as a result of the deprivation." <u>Barndt v. Wenerowicz</u>, 698 F. App'x 673, 677 (3d Cir. 2017) (citing cases). In light of prior decisions that have found deprivations for much longer periods of time failing to implicate the Eighth Amendment, Plaintiff's claims based on isolated instances of deprivation of exercise and shower are clearly insufficient to rise to the level of an Eighth Amendment violation. *See, e.g.*, <u>Barndt</u>, 698 F. App'x at 677 (temporary denial of out of cell exercise for twenty-eight days was not a substantial deprivation, nor was the denial of showers for a temporary period of time); <u>Adderly v. Ferrier</u>, 419 F. App'x 135, 140 (3d Cir. 2011) (denial of access to clothing, toiletries, legal mail, a pillow, a mattress, and showers for seven days did not "constitute a denial of the 'minimal civilized measures of life's necessities.'"); <u>Fortune v. Hamberger</u>, 379 F. App'x 116, 122 (3d Cir. 2010) (plaintiff had not set forth facts demonstrating that the alleged denial of exercise over a period of approximately two weeks while confined in

the RHU was sufficiently serious to deprive him of the "minimal civilized measure of life's

necessities."); <u>Pearson v. Ramos</u>, 237 F.3d 881, 884 (7th Cir. 2001) (denial of yard privileges for

no more than ninety days not cruel and unusual punishment); <u>Knight v. Armontrout</u>, 878 F.2d

1093, 1096 (8th Cir. 1989) (the denial of outdoor recreation for thirteen days does not constitute

cruel and unusual punishment); *see also* <u>Moneyham v. United States</u>, 2019 WL 6817380, at *6

(M.D. Pa. Nov. 19, 2019) (denial of a scheduled shower on a single occasion does not rise to the

level of an Eighth Amendment violation), *report and recommendation adopted*, 2019 WL

6826501 (M.D. Pa. Dec. 12, 2019).

### c.  <u>Unsanitary conditions</u>

Plaintiff claims that pursuant to Defendant Lackey's order, he was placed into a

hazardous contaminated "Accountability Cell" on February 9 and 10, 2018.  *See* ECF No. 3, ¶¶

24, 28.  He states that feces covered the windows and that the cells were infested with dirt, trash

and bugs.  <u>Id</u>.  Plaintiff also alleges that under Defendant Lackey's supervision the SRTU is

"mostly filthy and unsanit[ary]" and "hardly gets clean".  *See* ECF No. 3, ¶¶ 26-27.

While "[u]nsanitary conditions can be cruel and unusual," <u>Allah v. Bartkowski</u>, 574 F.

App'x 135, 138 (3d Cir. 2014) (citing <u>Young v. Quinlan</u>, 960 F.2d 351, 364 (3d Cir. 1992)), "the

mere presence of an unsanitary condition at a given point in time does not rise to the level of an

Eighth Amendment violation."  <u>Walker v. Regan</u>, 2018 WL 347685, at *3 (E.D. Pa. Jan. 9,

2018).  For the conditions of confinement to rise to the level of an Eighth Amendment violation,

they must deny the "minimal civilized measure of life's necessities."  <u>Farmer v. Brennan</u>, 511

U.S. 825, 835 (1970) (quoting <u>Rhodes</u>, 452 U.S. at 347).  Indeed, "the Constitution does not

mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes,

cannot be free of discomfort."  <u>Rhodes</u>, 452 U.S. at 349.  "To the extent that such conditions are

restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Id. at 347.

Here, Plaintiff's vague and unsupported allegations about unsanitary conditions in the "Accountability Cells" and the SRTU in general are insufficient to satisfy either the objective or subjective components of an Eighth Amendment claim. As to the objective prong, Plaintiff does not offer any facts that are necessary to show that he was subjected to genuine privation and hardship over any extended period of time in the "Accountability Cells" and his Complaint essentially expresses nothing but displeasure with less than perfect prison conditions in the SRTU. As to the subjective prong, there are no facts that show any defendant disregarded a substantial risk to Plaintiff's health and safety.

### d.  Toilet water

Plaintiff claims that the water to his toilet was shut off in his cell after a sewage flood on the unit on July 24, 2018, *see* ECF No. 3, ¶ 31, and again on August 4, 2018, *see* ECF No. 3, ¶ 68. He states that this resulted in a stench of urine and feces in his cell and he had to rely on officers to flush his toilet for him whenever they had time and he was on their "good side". It appears that the toilet water was shut off for at least two days on both occasions, but Plaintiff never specifically states when the water to his toilet was turned back on or how often his toilet was flushed by the officers.

While exposure to raw sewage may in some cases amount to cruel and unusual punishment, the analysis must be based on the "totality of the circumstances." *See* Howard v. Adkison, 887 F.2d 134, 137 (8th Cir. 1989). There appears to be no bright-line durational requirement for a viable unsanitary conditions claim, nor a minimal level of grotesquerie required. While some courts emphasize the duration of the conditions as being critical to an

Eighth Amendment analysis, at least one Court of Appeals has stated that "whether exposure to human waste is cruel and unusual depends on both the duration and the severity of the exposure." Willey v. Kirkpatrick, 801 F.3d 51, 68 (2d Cir. 2015).

Here, Plaintiff fails to satisfy the objective component necessary to establish an Eighth Amendment conditions of confinement claim based on the water being shut off to his toilet. While the Court accepts that the odor was unpleasant, a review of the totality of the circumstances of his confinement as set forth in the record does not demonstrate any credible threat to Plaintiff's health or safety. Specifically, there is an absence of evidence that Plaintiff was made to endure the sewage in his toilet for any more than two days on each occasion, and that period may have been even shorter since during this time, according to Plaintiff, prison officials remotely flushed his toilet when they had time. There are also no allegations in the Complaint that the sewage overflowed or that Plaintiff suffered any adverse health consequences due to his exposure to the smell of feces and urine. When looking at the case law on this issue, courts routinely find that confinement in conditions more severe and for longer periods do not implicate the Eighth Amendment. See, e.g., Davis v. Scott, 157 F.3d 1003, 1006 (5th Cir. 1998) (three day placement in cell with blood on walls and excrement on floors did not meet Eighth Amendment's objective component); Smith v. Copeland, 87 F.3d 265, 269 (8th Cir. 1996) (plaintiff's claim that he was subjected to an overflowing toilet in his cell for four days did not, without more, implicate constitutional concerns); see also Bracey v. Price, 2012 WL 6015727, at *16 (W.D. Pa. Dec. 3, 2012) (toilet water turned off for three days does not state an Eighth Amendment claim). Consequently, the Court finds that these conditions were neither severe nor protracted enough to rise to the level of an Eighth Amendment violation. Additionally, it appears that Plaintiff did not exhaust his administrative remedies with respect to any of the

grievances that he filed concerning his toilet water being shut off in his cell, Grievance Nos.

749185, 749319, 751481, 762405.  *See* ECF No. 120-7, pp.3-4.  However, it is not clear which

grievances were in reference to the incidents on July 24 and August 4, 2018.

Plaintiff also claims that he and the other inmates in his unit were forced to shower in the

two bottom unit showers where officers had disposed of "toilet water" with urine and feces after

the unit flooded on July 24, 2018, and again on August 1, 2018.  *See* ECF No. ¶¶ 29, 63.  Even

though the response to Plaintiff's grievance on this issue states that toilet water was not actually

pushed into the unit showers, *see* ECF No. 126, p.27 (referencing the response provided to

Grievance No. 749176), there are no allegations that Plaintiff suffered any actual physical harm

as a result of the condition of the showers and therefore the Court finds that the conditions do not

amount to an Eighth Amendment violation.  *See*, *e.g.*, Molina v. Harry, 2019 WL 3958422, at *2

(M.D. Pa. Aug. 22, 2019) ("absent additional information regarding the frequency, duration, or

health risks associated with the conditions at SCI Camp Hill's showers," allegations that showers

were dirty, had mildew and smelled of sewage, and had worms and other insects in drains did not

state an Eighth Amendment claim); *see also* Hall-Wadley v. Maint. Dep't, 386 F.Supp.3d 512,

518 (E.D. Pa. 2019) ("Numerous courts in this Circuit have held that the presence of mold in the

showers, without any allegations regarding harm, do not constitute an Eighth Amendment

violation.") (citing cases).

### e.  Remote control

Plaintiff claims that the television remote control was removed from the unit as

punishment by Corrections Officer Antczak on July 24, 2018.  *See* ECF No. 3, ¶ 30.  Even

though Corrections Officer Antczak is not named as a defendant in this action, such conduct

fails to amount to cruel and unusual punishment under the Eighth Amendment.  An objectively,

sufficiently serious injury for an Eighth Amendment claim based on prison conditions is one that denies the inmate "the minimal civilized measure of life's necessities," such as food, water, and shelter.  Rhodes, 452 U.S. at 347.  The removal of a remote to control the TV in the unit, for whatever reason, did not deny Plaintiff any basic human need and was certainly not cruel and unusual under contemporary standards.  Furthermore, it does not appear that Plaintiff exhausted his administrative remedies with respect to the grievance he may have filed on this issue, Grievance No. 749189.  *See* ECF No. 120-7, p.3.  However, it is once again not clear whether that grievance concerned the remote incident on July 24, 2018, and, according to the Corrections Defendants' chart, that grievance appears to have been filed against Corrections Officer Hamsack, not Corrections Officer Antczkak.

### f.  Decrease in incentive items

Plaintiff claims that incentive items authorized for purchase by inmates in phase 4 of the SRTU program decreased from 4 candy bars per week to 1 candy bar per week on August 9, 2018.  *See* ECF No. 3, ¶ 64.  Like the removal of the remote from his unit, this did not deny Plaintiff any basic human need and was not cruel and unusual under contemporary standards. Furthermore, it does not appear that Plaintiff exhausted his administrative remedies with respect to the grievance he filed on this issue, Grievance No. 751485.  *See* ECF No. 120-7, p.4.

### 9.  Fourteenth Amendment

Plaintiff appears to assert a claim under the Fourteenth Amendment, but other than identifying the Fourteenth Amendment and including the term "due process," it does not appear that he makes any specific allegations in support of an independent Fourteenth Amendment claim.  *See* ECF No. 3, ¶¶ 18, 69-71, 78, 98.  The Corrections Defendants nevertheless move for

summary judgment to the extent Plaintiff is attempting to assert a procedural due process claim

based on his placement and confinement in the SRTU.

In order to invoke the protection of the Due Process Clause of the Fourteenth

Amendment, a plaintiff must first establish the existence of a liberty interest for which the

protection is sought.  Wilkinson v. Austin, 545 U.S. 209, 221 (2005); Shoats v. Horn, 213 F.3d

140, 143 (3d Cir. 2000).  Only if a plaintiff establishes that the nature of the interest is one within

the contemplation of the liberty or property language of the Fourteenth Amendment is the second

step, i.e., determining what process is due, necessary.  Id.  A liberty interest may arise from the

Constitution itself or from an expectation or interest created by state laws or policies.  Wilkinson,

545 U.S. at 221.  The former has been characterized as an "independent due process liberty

interest" and the latter as a "state-created liberty interest."  Renchenski v. Williams, 622 F.3d

315, 325 (3d Cir. 2010).

With respect to an inmate's independent due process liberty interest, the Supreme Court

has held:

> As long as the conditions or degrees of confinement to which the prisoner is
> subjected is within the sentence imposed upon him and is not otherwise violative
> of the Constitution, the Due Process Clause does not in itself subject an inmate's
> treatment by prison authorities to judicial oversight.

Montanye v. Haymes, 427 U.S. 236, 242 (1976).  Here, Plaintiff was not subjected to

confinement that exceeded the sentence imposed upon him or that otherwise violated the

Constitution, and therefore no independent due process liberty interest itself was impinged.  See

Hewitt v. Helms, 459 U.S. 460, 468 (1983) ("It is plain that the transfer of an inmate to less

amenable and more restrictive quarters for nonpunitive reasons is well within the terms of

confinement ordinarily contemplated by a prison sentence.").

Plaintiff is also unable to demonstrate that he was deprived of a state-created liberty interest.  In Sandin v. Conner, 515 U.S. 472, 484 (1995), the Supreme Court set out the standard for determining whether a prisoner has been deprived of a state-created liberty interest.  These interests are "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id.; see also Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000); Asquith v. Department of Corrections, 186 F.3d 407, 412 (1999).  In ascertaining whether something is an "atypical and significant" hardship, courts must consider "what a sentenced inmate may reasonably expect to encounter as a result of his or her conviction in accordance with due process of law."  Asquith, 186 F.3d at 412 (quoting Griffin v. Vaughn, 112 F.3d 703, 706 & n.2 (3d Cir. 1997)).  In Sandin v. Conner, the Supreme Court held that an inmate's assignment to disciplinary segregation for thirty days did not impose an "atypical and significant deprivation" that implicated an inmate's liberty interest.  515 U.S. at 486.  In reaching this conclusion, the Supreme Court explained that disciplinary segregation at the prison generally "mirrored those conditions imposed upon inmates in administrative segregation and protective custody," the inmate's confinement in segregation "did not exceed similar, but totally discretionary, confinement in either duration or degree of restriction," and the inmate's segregation would not "inevitably affect the duration of his sentence."  Id. at 486-87.

In his response in opposition to summary judgment, Plaintiff appears to explain the numerous reasons why he believes the conditions in the SRTU are atypical, but the record contains no evidence suggesting that Plaintiff's placement in the SRTU departed from the accepted standards for confinement conditions or created an atypical hardship.  For example, the

Third Circuit has repeatedly found that placement in the New Jersey STGMU does not implicate a liberty interest.[6]  *See* Harris v. Ricci, 595 F. App'x 128, 131 (3d Cir. 2014); Fraise v. Terhune, 283 F.3d 506, 522-23 (3d Cir. 2002).  While New Jersey's STGMU and Pennsylvania's SRTU share many similarities because they both fall within the scope of the DOC's policies on Level 5 housing and Administrative Custody, the SRTU actually provides much more focus on out of cell time.  *See* Fraise, 283 F.3d at 523 n.1 (setting forth the restrictions imposed on inmates in the STGMU).  The record shows that in the SRTU Plaintiff is offered in excess of twenty hours of out-of-cell time per week, is given opportunities for contacts with other inmates in both structured and unstructured settings, and is provided with access to programming and other activities.  *See* ECF No. 119, ¶¶ 33-69.  Thus, the Court finds that Plaintiff is unable to demonstrate that his confinement in the SRTU implicated a state-created liberty interest, and, to the extent that he is making one, his procedural due process claim fails.  *See*, *e.g.*, Imes v. Wingard, 2017 WL 1400143, at *5 (W.D. Pa. Feb. 21, 2017), *report and recommendation adopted*, 2017 WL 1405794 (W.D. Pa. Apr. 18, 2017) (inmate's placement in Pennsylvania DOC's STGMU at SCI-Forest did not implicate liberty interest); Castro v. Superintendent Glunt, 2016 WL 6956828, at *4-6 (W.D. Pa. Oct. 19, 2016), *report and recommendation adopted*, 2016 WL 6988854 (W.D. Pa. Nov. 28, 2016) (same as to inmate's placement in STGMU at SCI-Greene); *see also* Bracey v. Secretary Pennsylvania Department of Corrections, 686 F. App'x 130, 135 (3d Cir. 2017) ("placement in the [Special Management Unit] did not constitute a

---

[6] The New Jersey Department of Corrections policy was promulgated in 1998 and is designed to isolate and rehabilitate gang members.  Fraise, 283 F.3d at 509.  Under this policy, prison officials can designate Security Threat Groups ("STG") and transfer the "core" members of these groups to the STGMU.

dramatic departure from the accepted standards for conditions of confinement such that due process was implicated").

To the extent Plaintiff is also asserting a substantive due process claim based on his confinement in the SRTU, and it does not challenge the same conduct as his Eighth Amendment conditions of confinement claim, and is thus not otherwise barred by the more specific provision rule, *see* Albright v. Oliver, 510 U.S. 266, 273 (1994); Betts v. New Castle Young Development Center, 621 F.3d 249, 260 (3d Cir. 2010), there has been no government conduct in this case that "shocks the conscience."  *See* Fagan v. City of Vineland, 22 F.3d 1296, 1303 (3d Cir. 1994) ("the substantive component of the Due Process Clause can only be violated by government employees when their conduct amounts to an abuse of official power that 'shocks the conscience.'") (citing Collins v. City of Harker Heights, Tex., 503 U.S. 115, 126 (1992)).

### 10. **SRTU phases**

Plaintiff appears to assert several claims against Defendants Spiker and Novak based on the SRTU program and his progress (or lack thereof) in the program.  *See* ECF No. 10, ¶¶ 6-7. The record demonstrates that Plaintiff was moved back from phase 3 to phase 4 in October 2018 because he had incurred several misconducts.  *See* ECF No. 119, ¶¶ 70-85.

With respect to any claim advanced under the Fourteenth Amendment, as discussed in the previous section, Plaintiff's placement in the SRTU did not implicate a protected liberty interest and therefore neither Plaintiff's failure to advance in the SRTU program, nor decisions to return Plaintiff to a prior phase of the program, violated due process.

### 11. **Fabricated misconduct**

Plaintiff claims that Defendant Rogers filed a false misconduct report against him on October 22, 2018.  *See* ECF No. 10, ¶¶ 8-9.  However, "the prison inmate has no constitutionally

guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." <u>Freeman v. Rideout</u>, 808 F.2d 949, 951 (2d Cir. 1986). Instead, the inmate "has the right not to be deprived of a protected liberty interest without due process of law." <u>Id</u>. Thus, the threshold question is whether the sanction imposed impacted a constitutionally protected liberty interest which would invoke procedural due process protections.

Here, the record shows that Defendant Rogers issued Plaintiff Misconduct No. D249799 on October 22, 2018, charging Plaintiff with Using Abusive Language and Refusing to Obey an Order. *See* ECF No. 119, ¶ 73. Because Plaintiff was in the SRTU, he was not placed in pre-hearing confinement in the Restricted Housing Unit. <u>Id</u>., ¶ 75. He was provided with a Mental Health/Intellectual Disability consultation after the misconduct was issued. <u>Id</u>., ¶ 76. On October 25, 2018, he was present for a Disciplinary Hearing before a DOC Hearing Examiner, and following the hearing, he was found guilty of both charges. <u>Id</u>., ¶ 77. He received a combined 30 days of Disciplinary Custody for his offenses. <u>Id</u>. However, he remained in the SRTU, under the same conditions, for the remainder of his stay at SCI-Greene and was not placed in the RHU as a result of his Misconduct. <u>Id</u>., ¶ 78.

In his response to the summary judgment motion, Plaintiff claims that the Misconduct resulted in his loss of phase 3 status in the SRTU and he therefore had to "start the program over." *See* ECF No. 126, ¶ 50. The summary judgment record appears to support this assertion and shows that Plaintiff was returned to phase 4 on October 31, 2018, due to recent misconducts and other behavioral issues. *See* ECF No. 119, ¶¶ 79-80, 85. However, as previously addressed in relation to Plaintiff's due process claim, Plaintiff's placement in the SRTU, no matter what phase, was not enough to establish an atypical deprivation sufficient to implicate a liberty

29

interest that would invoke due process protections.  *See*, *supra*.  Nevertheless, the record shows that Plaintiff was afforded an opportunity to be heard and to defend against the allegedly falsified reports, and, therefore, his claim that he was denied due process lacks merit.  Additionally, it does not appear that Plaintiff exhausted his administrative remedies with respect to the grievance he filed on this issue, Grievance No. 767872.  *See* ECF No. 120-7, p.4.

### 12. Verbal harassment

Plaintiff alleges that certain Corrections Defendants threatened him, ridiculed him, taunted him and/or called him names.  *See* ECF No. 3, ¶¶ 62, 95-97; No. 9, ¶¶ 4, 7; No. 10, ¶ 6.  However, verbal harassment of a prisoner, although distasteful, does not violate the Eighth Amendment.  McBride v. Deer, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001); DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000); *see also* Robinson v. Taylor, 204 F. App'x 155, 156 (3d Cir. 2006) ("It is well settled that verbal harassment of a prisoner, although deplorable, does not violate the Eighth Amendment.")

### 13. Equal protection

Plaintiff appears to assert an equal protection claim against Defendant Spiker based on Spiker's refusal to give Plaintiff his "incentive items" on July 26, 2018.  *See* ECF No. 3, ¶ 61.  He claims that Spiker's refusal to allow Plaintiff to exchange his incentive points was racially motivated.

The Fourteenth Amendment states that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV.  Put simply, the Equal Protection Clause requires that "all persons similarly circumstanced shall be treated alike."  F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 415 (1920).  The Supreme Court has explained that "'[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure

every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'" Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 445 (1923) (quoting Sunday Lake Iron Co. v. Township of Wakefield, 247 U.S. 350, 352 (1918)).  Thus, an equal protection claim arises when a person alleges that the state has treated him differently from others similarly situated.  Williams v. Morton, 343 F.3d 212, 221 (3d Cir. 2003).

The summary judgment record reflects that inmates in the SRTU program can earn incentive points for positive participation in the program.  *See* ECF No. 119, ¶¶ 60-61.  The incentive points can then be exchanged for *extra* food or privileges.  Id., ¶¶ 62-63.  The items for which incentive points can be redeemed vary depending on the inmate's current phase in the SRTU program.  Id., ¶ 63.  In order to progress from one phase to the next, the inmate must generally remain misconduct free, maintain good personal and cell hygiene, and participate in a minimum of sixty percent of offered out-of-cell programming.  Id., ¶ 64.  If the inmate fails to meet these requirements, his time in that phase can be extended, or he can be moved back to the previous phase, depending on the seriousness of the inmate's non-compliance.  Id., ¶ 65.  An inmate in the SRTU may also be placed on Accountability Status if they engage in certain behaviors or otherwise fail to follow all applicable rules and policies of the SRTU program.  Id., ¶ 67.  An inmate in Accountability Status remains in his current phase but is subject to a range of restrictions related to the identified behavioral issues.  Id., ¶ 68.  One of the available restrictions is the inability to redeem incentive points while on Accountability Status.  Id., ¶ 69.

Plaintiff has failed to show that he was treated differently because of his race.  The record clearly reflects that Plaintiff was not permitted to exchange his incentive points because he was

on Accountability Status on July 26, 2018.  *See* ECF No. 120-11.  Accordingly, Plaintiff's equal protection claim fails.

Additionally, to the extent Plaintiff also asserts an equal protection claim against any Corrections Defendants for an alleged disparity in mental health treatment between African American and Caucasian inmates, said claim fails for the same reason it failed against Defendant Berger.  *See* ECF No. 58, pp.8-9.

### 14. Deliberate indifference to serious mental health needs

Plaintiff asserts claims of deliberate indifference to his serious mental health needs.  In this regard, prison officials violate an inmate's Eighth Amendment rights when they are deliberately indifferent to an inmate's serious medical need.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  "A serious medical need exists where 'failure to treat can be expected to lead to substantial and unnecessary suffering,' and a doctor has diagnosed the condition, or the need for treatment would be obvious to a lay person."  Dooley v. Wetzel, 957 F.3d 366, 374 (3d Cir. 2020) (quoting Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991)).  "Officials are deliberately indifferent to such needs when they are actually aware of a substantial risk of serious harm and disregard that risk."  Id. (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

The first of Plaintiff's claims appears to be a broad claim challenging the overall operation of the SRTU when an inmate with serious mental health issues experiences what Plaintiff describes as a "mental health crisis."  *See* ECF No. 3, ¶¶ 21, 27.  Specifically, he claims that when an inmate is suicidal and experiences a "mental health crisis," they are treated with force and sprayed with OC spray instead of being placed in a psychiatric observation cell. Plaintiff, however, does not appear to be challenging such alleged unconstitutional conduct as it

relates to himself on any specific date,[7] and, to the extent he is attempting to raise a claim of deliberate indifference for other inmates whom he believes have been mistreated,  he lacks standing to do so.  *See* <u>Warth v. Seldin</u>, 422 U.S. 490, 499 (1975) (plaintiffs in federal court are barred from asserting the constitutional and statutory rights of others).  Indeed, a federal court's jurisdiction "can only [be] invoked when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action.'"  <u>Id.</u> (citing <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 617 (1973)).  Because it does not appear that Plaintiff is asserting a claim for a violation of his own rights, then this claim cannot proceed.

Plaintiff's remaining deliberate indifference claim appears to stem from what he says was a "mental health crisis" he experienced on April 24, 2018.  *See* ECF No. 3, ¶¶ 39, 47-52.  He claims that he was intentionally ignored for over an hour by Corrections Officers Hennessey and Anderson, neither of whom are defendants in this action, even though they both noticed that he was cutting himself, and he also claims that Defendant Brawdy did not allow him to go to a psychiatric observation cell on that day even though Plaintiff informed Brawdy that he was suicidal.  *See* ECF No. 3, ¶¶ 57, 60.  Plaintiff filed grievances about his claims related to the events of April 24, 2018, and the responses to those grievances following an investigation reflect that corrections staff were not deliberately indifferent to Plaintiff's mental health needs on that day.  Instead, they show that Officer Hennessey notified appropriate staff when he noticed blood on Plaintiff's window and then Plaintiff was assessed by a psychology treatment professional who determined that placement in a psychiatric observation cell was not necessary.  *See* ECF No.

---

[7] The only date provided in the Complaint with respect to these allegations is February 27, 2018, but that appears to be the day that he "asked" Defendant Lackey "why" force is always used when an inmate has a mental health crisis and why inmates are not allowed to go to psychiatric observation cells when they experience a mental health crisis.  *See* ECF No. 3, ¶¶ 21, 27.

120-8, pp.22-59.  Plaintiff is therefore unable to show that any Corrections Defendant knew of and disregarded a serious harm to his health and safety.

### 15. Remaining claims/issues

To the extent there are any remaining claims in the Complaint that have not been specifically addressed in this Opinion, they are deemed to be without merit.  Furthermore, to the extent Plaintiff raises new claims in his brief in opposition to summary judgment, those claims will not be considered since Plaintiff may not amend his complaint by his response to the summary judgment motion.  Grayson v. Mayview State Hospital, 293 F.3d 103, 109 n.9 (3d Cir.2002) ("For the sake of clarity, a prisoner plaintiff (or any other plaintiff) should not be able effectively to amend a complaint through any document short of an amended pleading.").  *Accord* Commonwealth of Pa. ex. rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir.1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").  This is true notwithstanding the fact that Plaintiff is *pro se*.  *See*, *e.g.*, McArdle v. Tronetti, 961 F.2d 1083, 1089 (3d Cir.1992) (applying rule of Zimmerman v. PepsiCo. but the *pro se* litigant there was an attorney); Martin v. Zook, 1988 WL 33919 (E.D. Pa. March 31, 1988) (applying rule of Zimmerman v. PepsiCo. to *pro se* lay plaintiff).

A separate order will issue.

Dated:  June 1, 2022.

Lisa Pupo Lenihan
United States Magistrate Judge

Cc:     Jerome Junior Washington

34

HV-0282
SCI Rockview
Box A
1 Rockview Place
Bellefonte, PA  16823

Counsel for Defendants
(Via CM/ECF electronic mail)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JEROME JUNIOR WASHINGTON, | ) | |
| | ) | Civil Action No. 18 – 1390 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| JOHN E. WETZEL, *Commissioner*, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## **ORDER**

**AND NOW**, this 1st day of June, 2022,

**IT IS HEREBY ORDERED** that, for the reasons stated in the Court's Memorandum Opinion issued contemporaneously herewith, the Motion for Summary Judgment filed by the Corrections Defendants (ECF No. 117) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of Defendants and mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that, pursuant to Federal Rule of Appellate Procedure 4(a)(1), if Plaintiff desires to appeal from this Order he must do so within thirty (30) days by filing an appeal as provided for in Federal Rule of Appellate Procedure 3.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Cc:     Jerome Junior Washington
        HV-0282
        SCI Rockview
        Box A
        1 Rockview Place
        Bellefonte, PA  16823

        Counsel for Defendants
        (Via CM/ECF electronic mail)